# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

BRYAN P. LEATHER,

                      Petitioner,

v.

WARDEN JOHN PAQUIN,

                      Respondent.

Case No. 12-CV-1205-JPS

ORDER

On December 20, 2006, the State of Wisconsin charged the petitioner, Bryan Leather, with one count of second degree sexual assault of a child. (Docket #2, Ex. 1). After extraordinary delays in the pretrial process—during which time the charge against Mr. Leather was altered and added to (*see* Docket #2, Exs. 6–8)—the matter was tried to a jury in July of 2009 (Docket #2, Exs. 14–25). After the trial court judge allowed the prosecution to amend the pleadings so that the charges against Mr. Leather reflected the evidence presented during testimony (which the Court will discuss in further detail, below), the jury found Mr. Leather guilty of two counts of sexual assault of a child. (*See* Docket #2, Ex. 22, at 69; Docket #2, Ex. 25, at 39). The trial court sentenced Mr. Leather to 10 years of initial confinement and 10 years of extended supervision. (Docket #2, Exs. 26–28). Mr. Leather thereafter appealed to the Wisconsin Court of Appeals, which affirmed his conviction. (Docket #2, Ex. 29). The Wisconsin Supreme Court denied his subsequent petition for review on September 1, 2011. (Docket #2, Ex. 30).

Thereafter, Mr. Leather filed the petition for a writ of habeas corpus that is currently before this Court. (Docket #1). The petition was screened (Docket #4), after which the State of Wisconsin ("Wisconsin" or "the State," which appears on behalf of the respondent) raised exhaustion and

procedural default issues (Docket #8). The Court ordered that the parties address those issues in briefing. (Docket #9). After receiving the parties' submissions (Docket #10, #11), the Court determined that Mr. Leather could proceed on his habeas claims and directed the parties to file briefs addressing the substance of Mr. Leather's habeas petition (Docket #13). The parties did so. (Docket #13, #15, #18).

The matter is now fully briefed, so the Court will address it. In doing so, the Court will begin by discussing the underlying facts in greater detail. Thereafter, the Court will address Mr. Leather's substantive claims in support of his petition.

1.    BACKGROUND

1.1    Pre-Charge Factual Background

Mr. Leather married Nicola Ciurro in 1995. (Docket #2, Ex. 23, at 16–17). Both brought children from previous marriages; most relevant to this case is Ms. Ciurro's daughter, M.W. (*See* Docket #2, Ex. 23, at 17). At the time Ms. Ciurro married Mr. Leather, she told him that M.W. had been diagnosed as being on the autism spectrum. (Docket #2, Ex. 23, at 17).

Ten years later, on December 12, 2006, M.W. told Ms. Ciurro that Mr. Leather had touched her inappropriately. (Docket #2, Ex. 16, at 49). Ms. Ciurro confronted Mr. Leather about this allegation, but did not make an official report that night. (Docket #2, Ex. 16, at 55–56). The next morning, Ms. Ciurro took M.W. to school—where Ms. Ciurro was principal and M.W. was a student—and arranged for M.W. to meet with a social worker. (Docket #2, Ex. 16, at 50–51). The social worker contacted Child Protective Services (CPS), which arranged to take M.W. to a secure location and ask her additional questions. (*See* Docket #2, Ex. 16, at 51–52). During that questioning, M.W. apparently disclosed additional occurrences of alleged abuse. (*See* Docket #2,

Ex. 16, at 52). At some point during this process, M.W. received a medical examination. (Docket #2, Ex. 16, at 53).

On the night of December 13, 2006, after M.W. had made her allegations, the police arrested Mr. Leather. (Docket #2, Ex. 16, at 37–38). Mr. Leather was taken downtown to the Police Administration Building for criminal processing. (Docket #2, Ex. 16, at 39). What happened during the interrogation was the subject of a significant pretrial dispute, which the Court will discuss in further detail when discussing the procedural history of the case. Suffice it to say, for purposes of recounting the factual background, that Mr. Leather alleged that he: (1) was vehemently discouraged from receiving a lawyer; (2) was coerced into signing a confession that had been written by the investigating officer; and (3) was forced to write a separate apology letter to his wife (which the investigating officer forced him to alter in several places). (Docket #2, Ex. 12, at 47–57). Throughout this interview, Mr. Leather—who is blind in one eye—was allegedly suffering from symptoms of not having recently taken his prescription medications, which apparently treat his depression and Parkinson's Disease. (Docket #2, Ex. 12, at 33, 48, 51).

### 1.2    Early Stages of Legal Proceedings

On December 20, 2006, Mr. Leather was charged in Milwaukee County Circuit Court with a single count of second degree sexual assault of a child. (Docket #2, Ex. 1). Mr. Leather maintained a not guilty plea throughout the state court proceedings. (*See* Docket #2, Ex. 1, and subsequent entries in the record).

After being charged, Mr. Leather ran into significant hurdles in presenting his defense, as there were major delays in processing his case, specifically two very important motions that he had filed.

The first motion was a *Miranda-Goodchild* motion, seeking to have his confessions barred on the basis of his assertion that he had not been read his *Miranda* rights and/or had been unlawfully coerced into confessing. (*See* Docket #2, Ex. 2). The record shows that, on October 24, 2007—more than ten months after Mr. Leather had been formally charged—this motion came before Judge Jeffrey Wagner, apparently after Judge William Brash had heard other portions of the case. (*See* Docket #2, Ex. 2, at 1, 10–11). The *Miranda-Goodchild* motion had come before Judge Brash four prior times, but never was addressed on its merits. (Docket #2, Ex. 2, at 9). And, likewise, on October 24, 2007, it went unaddressed again. On that day, the prosecutor informed Judge Wagner and Mr. Leather that the prosecution would not be able to proceed with the *Miranda-Goodchild* hearing or the previously-scheduled jury trial, because their investigative witness was to be deployed to Iraq for at least nine months. (Docket #2, Ex. 2, at 1–10). Over Mr. Leather's objection, Judge Wagner granted an adjournment of the case, meaning that Mr. Leather's *Miranda-Goodchild* motion went unaddressed yet again. (Docket #2, Ex. 2, at 14–15).

The second motion—brought by Mr. Leather pursuant to *Wisconsin v. Schiffra*, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993)—was also discussed at the October 24, 2007, hearing. (Docket #2, Ex. 2, at 2–12). Under *Schiffra*, where a defendant makes a "preliminary showing that [otherwise privileged] evidence is material to his or her defense," the trial judge must conduct an *in camera* review of the evidence and allow the defendant to use any records that the judge determined to be relevant to the defense. 175 Wis. 2d at 605; 499 N.W.2d at 721. Mr. Leather attempted to use the *Schiffra* case to access M.W.'s psychological treatment records. (*See* Docket #2, Ex. 2, at 3–4). And that tactic was logical: the prosecution's case against him rested heavily on

M.W.'s testimony against Mr. Leather (in conjunction with Mr. Leather's confessions). She was the only actual witness to the abuse, so her ability to accurately perceive and report the abuse against her was very important to the defense. For a substantial period of time, though, Mr. Leather did not receive the benefit of a ruling on his *Schiffra* motion. (*See* Docket #2, Ex. 2, at 3–4). Judge Brash heard arguments on the motion in March of 2007, but withheld a final ruling, ordering the prosecution to produce school and psychological records in the meantime. (Docket #2, Ex. 2, at 3–4). That matter still was not addressed and the records had not been turned over by the time of the October 24, 2007 hearing before Judge Wagner.

Judge Wagner did not substantively address either of those motions at the October 24, 2007 hearing. Rather, he converted the originally-scheduled trial date to a pretrial conference and requested that Mr. Leather, through counsel, prepare an order directing the disclosure of the school and psychological records. (Docket #2, Ex. 2, at 13, 15). Otherwise, Judge Wagner held the substance of the motions in abeyance.

The pretrial conference took place on December 3, 2007, but nothing was resolved. (*See* Docket #2, Ex. 3). In fact, the prosecutor was not able to attend the hearing and instead sent a co-worker who had little knowledge of the case. (Docket #2, Ex. 3, at 4, 9).

### 1.3 First *Schiffra* Ruling

Finally, Judge Wagner received M.W.'s records and reviewed them. He then conducted a hearing on June 23, 2008, to discuss his review of those materials. (Docket #2, Ex. 4). He noted that he had reviewed the psychological and school reports and that most of them "had to do with academic performance and social functioning memory, but has nothing to do with anything exculpatory." (Docket #2, Ex. 4, at 3). Defense counsel asked

whether the records disclosed that M.W. was "cognitively disabled or retarded," and Judge Wagner responded that "that may be the case[, b]ut the Court doesn't find that probative." (Docket #2, Ex. 4, at 3–4). But then Judge Wagner backtracked. After defense counsel pointed out that a hospital report established that M.W. presented cognitively as "somebody 8 to 10-years-old," despite being 17 years old at the time of the report, Judge Wagner stated "[i]t depends on what you believe would be proffered as far as cross-examination of that witness. I mean certainly some of that would be allowed, but most of it wouldn't be probative nor relevant." (Docket #2, Ex. 4, at 4–5).

Unfortunately, Judge Wagner then took counsel off the record. (Docket #2, Ex. 4, at 5). It is unclear precisely what the parties discussed with Judge Wagner in chambers, but, upon returning to the courtroom, Judge Wagner stated that "within one of those [*Schiffra*] documents may contain something that may be relevant after discussing it with both counsel. So the Court is going to re-review that and that portion of those records." Judge Wagner then adjourned the hearing until July 14, 2008. Before recessing, defense counsel made the following clarifying remark about what was discussed in chambers: "The report reflects a cognitive disability that relates to reality. That's what we've asked the Court to review, and you've indicated that's acceptable." Judge Wagner never corrected that representation and shortly thereafter adjourned the proceeding.

The parties returned for additional *Schiffra*-related proceedings on July 15, 2008, but there were intervening changes. First, the original prosecutor had left the District Attorney's Office, leaving two new prosecutors to appear at the hearing. (*See* Docket #2, Ex. 5, at 2). More importantly, Judge Wagner had a change of heart about the potential relevance of the records. (*See* Docket #2, Ex. 5, at 2–3). Whereas he had originally believed that some of the

records indicated that M.W. struggled to keep in touch with reality, now Judge Wagner stated that there were "speech and language disabilities," "specific learning disabilities," and "autism," but that there was nothing in the report that would be relevant. (Docket #2, Ex. 5, at 2–3). Judge Wagner did not clarify why he had changed his mind. (Docket #2, Ex. 5, at 3). He noted that "[t]here might be an issue when she would read something that there might be an issue as to fact and fiction." (Docket #2, Ex. 5, at 3). But Judge Wagner was not assigned to try the case, so he stated that Mr. Leather would be allowed to bring the motion up again in front of the actual trial judge. (Docket #2, Ex. 5, at 4).

Judge Wagner then scheduled the matter for a trial to begin on November 17, 2008. (Docket #2, Ex. 5, at 9).

### 1.4    Proceedings Before Judge Franke

Of course, that trial date was not kept, either; instead, a new judge —Judge John Franke—had taken over the case and used the date as a status conference "to make some sense out of th[e] case and get it moving in a direction that would be helpful." (Docket #2, Ex. 6, at 2).[1] The parties discussed many important topics at the hearing, most importantly the outstanding *Miranda-Goodchild* issue (Docket #2, Ex. 6, at 11–16, 38–39) and the *Schiffra* motion (Docket #2, Ex. 6, at 28–37, 40–46).[2] Specifically, as to the still-outstanding *Miranda-Goodchild* motion, Judge Franke set a hearing to

---

[1] There was also a new prosecutor—Sara Lewis— who would ultimately take the case to trial.

[2] The parties also discussed the fact that the prosecution had determined that the original complaint suffered from errors. This had required the filing of an amended complaint (the first of several in the case). (Docket #2, Ex. 6, at 4–6, 16–26). The parties also discussed the prosecution's reluctance to disclose colposcope, pregnancy, and STD tests of M.W. to the defense. (Docket #2, Ex. 6, at 7–10).

address the merits of that motion. Judge Franke also addressed the *Schiffra* issue in part by clarifying that the prosecution seemed to have decided not to call M.W. (Docket #2, Ex. 6, at 46–48). He then denied all of the *Schiffra* and other discovery motions in full, requiring defense counsel "to start over." (Docket #2, Ex. 6, at 58). In doing so, he discussed the merits of Mr. Leather's request for the records, finding that the records were largely irrelevant to the proceedings. (Docket #2, Ex. 6, at 58–67).

### 1.5 *Miranda-Goodchild* Hearing and Other Pretrial Procedure Before Judge Franke

The *Miranda-Goodchild* hearing was scheduled to begin on January 2, 2009, before yet another judge, Judge Jeffrey Conen. (*See* Docket #2, Ex. 8). The parties started off that hearing by discussing the *Schiffra* motion, with Judge Conen stating that the *Schiffra* issue was largely moot because the prosecution did not plan to call M.W. (Docket #2, Ex. 8, at 4–8). Mr. Leather also requested that the prosecution be required to turn over a copy of records relating to an allegedly false abuse allegation that M.W. leveled against Mr. Leather. (Docket #2, Ex. 8, at 21–23). Judge Conen then conducted a portion of a preliminary hearing on the first amended complaint, because one had never been held before that point. (Docket #2, Ex. 8, at 44–92). He resumed that preliminary hearing on January 23, 2009, and allowed the prosecution to proceed on its amended complaint. (Docket #2, Ex. 10).

After resolving the complaint issue, at the same January 23, 2009 hearing, Judge Conen brought up an issue of *ex parte* communication from the Wisconsin Attorney General's office. (*See* Docket #2, Ex. 10, at 24). Apparently, he found a copy of a letter in the record that had been sent by Crime Victim Services to Judge Franke, urging swift completion of the case. (Docket #2, Ex. 10, at 25–26). While the letter was addressed to Judge Franke,

it was sent after Judge Conen had taken over the case. (Docket #2, Ex. 10, at 27). In any event, Mr. Leather had not received a copy of that letter. (*See* Docket #2, Ex. 10, at 24–28). Accordingly, Mr. Leather requested that Judge Conen recuse himself from the case. (Docket #2, Ex. 10, at 28). Judge Conen took that request under advisement for approximately 15 minutes. (Docket #2, Ex. 10, at 32–33). Upon returning to the bench, he stated that he would not recuse himself, because it was his standard practice to move cases quickly, meaning that the letter ultimately had no impact on his processing of the case. (Docket #2, Ex. 10, at 33–34). Mr. Leather strenuously objected, but could not persuade Judge Conen to recuse himself. (*See* Docket #2, Ex. 10, at 34–40).

Judge Conen adjourned the January 23, 2009 hearing, again without reaching the *Miranda-Goodchild* issue.

Judge Conen reconvened court for the *Miranda-Goodchild* hearing on April 27, 2009. (Docket #2, Ex. 11). But, before he could reach that issue, he had to arraign Mr. Leather on the third amended information. (*See* Docket #2, Ex. 11, at 1–5). Judge Conen then discussed the *Schiffra* motion with counsel again. (Docket #2, Ex. 11, at 13–25). Judge Conen stated that two judges had gone through the submitted records and found nothing that would have to be disclosed to Mr. Leather, so he refused to go through the records himself. (Docket #2, Ex. 11, at 13–16). He also noted that Mr. Leather's *Schiffra* motion was very broad and seemed to require that the judge go on a "fishing expedition" on the defense's behalf. (Docket #2, Ex. 11, at 13–17). Defense counsel attempted to call Judge Wagner as a witness, since he could allegedly testify to what he had originally found in the records that caused him to question M.W.'s connection to reality (a finding that he later reconsidered when denying the defense's request to access M.W.'s records). (*See* Docket

#2, Ex. 11, at 30–31). The parties could not get a hold of Judge Wagner, so Judge Conen denied Mr. Leather's *Schiffra* motion, giving him leave to renew it if he could secure Judge Wagner's testimony. (Docket #2, Ex. 11, at 32).

Mr. Leather also raised, for the first time, a *Schiffra* motion to receive his ex-wife's mental health records. (Docket #2, Ex. 11, at 24–25). Judge Conen also denied that motion. (Docket #2, Ex. 11, at 32).

The prosecutor then informed Judge Conen that she did not plan to call M.W. as a witness. (Docket #2, Ex. 11, at 34–36). But, to achieve that, the prosecutor would have to achieve corroboration of Mr. Leather's confession by some other means, and so she discussed calling Mr. Leather's ex-wife or a nurse to testify to the fact that M.W. had received sexual assault tests. (Docket #2, Ex. 11, at 36–39).

Defense counsel then floated a new theory for their case: that M.W. had been engaging in sexual activity with a fellow student and had indicated that Mr. Leather had sexually assaulted her in order to cover up that fact. (Docket #2, Ex. 11, at 41–45).

Mr. Leather renewed his request to receive copies of the reports regarding unsubstantiated allegations of abuse made by M.W. against Mr. Leather. (Docket #2, Ex. 11, at 48–52). Judge Conen denied that request.

Finally, Judge Conen took up the *Miranda-Goodchild* portion of the hearing. (Docket #2, Ex. 11, at 54). The prosecution began by calling Erica LeMahieu, the detective who had initially questioned Mr. Leather and obtained a confession from him. (Docket #2, Ex. 11, at 56–86). At the close of direct examination, Judge Conen scheduled the rest of the hearing to occur at another time. (Docket #2, Ex. 11, at 89).

The hearing resumed on June 5, 2009, at which time Ms. LeMahieu was subject to cross and redirect examinations. (Docket #2, Ex. 12, at 1–32).

Mr. Leather was then directly examined by his counsel. (Docket #2, Ex. 12, at 32–58). His testimony directly conflicted with that of Ms. LeMahieu. For example, he said that he was pressured into rejecting counsel, whereas she mentioned nothing of the sort; he testified that she coerced him to write the confessional letter to his family under duress, but she testified that the letter was totally voluntary; he testified that he had not had his medications, whereas she stated that she had no recollection of him needing medications. (*Compare* Docket #2, Ex. 11, at 56–86, and Docket #2, Ex. 12, at 1–32, *with* Docket #2, Ex. 12, at 32–58). The prosecutor was, apparently, surprised by Mr. Leather's testimony, and requested an adjournment to allow her to obtain and review a copy of the transcript of his testimony. (Docket #2, Ex. 12, at 58). Judge Conen acquiesced and adjourned the *Miranda-Goodchild* hearing yet again. (Docket #2, Ex. 12, at 59).

The parties returned on June 12, 2009, to complete the hearing. (Docket #2, Ex. 13). The prosecutor engaged in an extremely short cross-examination of Mr. Leather. (Docket #2, Ex. 13, at 4–6). She then called Ms. LeMahieu as a rebuttal witness. (Docket #2, Ex. 13, at 6). Ms. LeMahieu was examined by counsel in direct, cross, redirect, and recross-examinations. (Docket #2, Ex. 13, at 6–27). She maintained that Mr. Leather's account of the interrogation was a fabrication. (*See* Docket #2, Ex. 13, at 6–27). Judge Conen then provided the parties with the opportunity to argue their positions. (Docket #2, Ex. 13, at 28–35).

Finally, Judge Conen concluded that Ms. LeMahieu's testimony was much more credible than Mr. Leather's. (Docket #2, Ex. 13, at 35–40). Accordingly, he denied Mr. Leather's *Miranda-Goodchild* motion. (Docket #2, Ex. 13, at 35–40).

Judge Conen having made that finding, the matter was then ready for trial. (Docket #2, Ex. 13, at 40–41). Judge Conen asked that the parties brief the issue of what would be necessary for corroboration of the confession, and, specifically, whether M.W. would need to be called as a witness. (Docket #2, Ex. 13, at 40–41).

### 1.6 Trial and Sentencing Before Judge Conen

The first day of trial—July 6, 2009—arrived with much uncertainty. The parties were still uncertain whether M.W. would have to testify to corroborate Mr. Leather's confession, and the parties offered argument to Judge Conen on that topic. (Docket #2, Ex. 14, at 5–12). Mr. Leather urged Judge Conen to find that significant corroboration would be necessary. (Docket #2, Ex. 14, at 11–12). Judge Conen expressed his doubts about the prosecution's proffered corroboration, finding that anything other than M.W.'s testimony would not offer any significant corroboration. (Docket #2, Ex. 14, at 13–15).

The parties then began taking up several outstanding motions *in limine*. (Docket #2, Ex. 14, at 15). Judge Conen prohibited Mr. Leather from presenting his theory that M.W. had accused him of the crimes at issue to cover up her sexual activity with a fellow student. (Docket #2, Ex. 14, at 15–22).

Judge Conen then took up the matter of M.W.'s allegedly false prior allegation of abuse against Mr. Leather. (Docket #2, Ex. 14, at 22). Judge Conen initially held that: "It will be allowed to come in for the very limited purpose of the fact that it's unsubstantiated and we'll leave it at that." (Docket #2, Ex. 14, at 24). The prosecutor then pushed the topic further, and defense counsel noted that he had a copy of the unsubstantiated report. (Docket #2, Ex. 14, at 25–26). The prosecutor had not received a copy of that

report, and defense counsel had difficulty establishing how they had received it. (Docket #2, Ex. 14, at 26–29). Judge Conen took the matter under advisement while he addressed other matters.

He resolved that the parties would not be allowed to categorize M.W. "as a retard, schizophrenic, out of touch with reality, having violent propensities, or any other claim or description of her under those circumstances." (Docket #2, Ex. 14, at 29). Defense counsel objected, but Judge Conen reiterated his position and refused to allow any of the *Schiffra* materials as evidence. (Docket #2, Ex. 14, at 29–33).

Judge Conen then took care of the remaining motions *in limine*. He held in abeyance a motion regarding the mental health records of Mr. Leather's ex-wife, because it was unclear whether she would testify. (Docket #2, Ex. 14, at 34–35). He told the parties that they would not be allowed to refer to Mr. Leather's divorce from his ex-wife. (Docket #2, Ex. 14, at 35–39). Judge Conen denied a motion to prevent inquiry into M.W.'s motive to falsify allegations against Mr. Leather. (Docket #2, Ex. 14, at 39–40). He allowed Mr. Leather to present testimony regarding the alleged falsity of his confession. (Docket #2, Ex. 14, at 40–41).

Mr. Leather moved for an adjournment of the trial because M.W. was made a witness by the need for corroboration. (Docket #2, Ex. 14, at 42–43). Indeed, the prosecution had maintained that it would not call M.W.; but the Court's holding requiring specific corroboration necessitated her testimony. (*See* Docket #2, Ex. 14, at 43). And Mr. Leather had strongly favored requiring specific corroboration and known, generally, that M.W. remained a potential witness. (*See* Docket #2, Ex. 14, at 43). Accordingly, the Court denied the requested adjournment.

Upon returning from a short break, the parties again took up the matter of the records from the unsubstantiated assault. (Docket #2, Ex. 15, at 6). Judge Conen found that the report did not actually speak to M.W.'s truthfulness. (Docket #2, Ex. 15, at 6, 11–12). He also inquired into defense counsel's receipt of the report. (Docket #2, Ex. 15, at 7–10). Defense counsel struggled to provide any legitimate explanation, but ultimately provided a story about a state employee bringing the record and making a copy in the District Attorney's office. (Docket #2, Ex. 15, at 8–10, 12–13). Judge Conen did not fully credit the story. (Docket #2, Ex. 15, at 12–14). He also pointed out portions of the report that would potentially have indicated that M.W. *had* actually been abused by Mr. Leather, such as Mr. Leather expressing his remorse. (Docket #2, Ex. 15, at 14). Judge Conen then ruled that the report was not relevant; he refused to enter the report into the record and accused defense counsel of potential misconduct. (Docket #2, Ex. 15, at 15–19).

Trial then proceeded to jury selection. Aside from a few fireworks at the beginning of selection regarding a prior lawyer who had been involved in investigating defense counsel for alleged disciplinary problem,[3] jury selection was mostly uneventful, and a jury was empaneled. (Docket #2, Ex. 15, at 20–85).

Judge Conen provided opening instructions the following morning, July 7, 2009, after which the parties offered opening statements. (Docket #2, Ex. 16, at 14–37). An officer involved in the case, Mr. Leather's ex-wife, and the doctor who worked with M.W. to receive the abuse allegations all testified without any events that are at issue in the habeas case that the Court

---

[3]This potential juror was excused. (Docket #2, Ex. 14, at 24).

is currently considering. (*See* Docket #2, Ex. 16, at 37–80; Docket #2, Ex. 17, at 2–68).

The real fireworks—which form a significant portion of Mr. Leather's claims in this habeas action—began on July 8, 2009, when M.W. testified. (Docket #2, Ex. 18). M.W. began by discussing three incidents in which Mr. Leather had allegedly touched her buttocks and/or breast, when she was "13, 14 and 16." (Docket #2, Ex. 18, at 20–45). But then she began to discuss an incident in which Mr. Leather had touched her vagina. (Docket #2, Ex. 18, at 46). M.W. reported that Mr. Leather used his hand under her clothing to "dig" into her vagina. (Docket #2, Ex. 18, at 45–47).

Mr. Leather was taken by surprise; to that point, he had never been told of this allegation. (Docket #2, Ex. 18, at 47–49). The Court held a sidebar at which defense counsel pointed out that none of the various amended charges had ever accused Mr. Leather of this activity, and requested that the testimony be struck or that Judge Conen grant a mistrial. (Docket #2, Ex. 18, at 48–49).

Judge Conen "suggest[ed] at sidebar" that the prosecutor "go through the police reports and medical reports to see if there is anything that may in any way be related to this particular incident." (Docket #2, Ex. 18, at 49). And, indeed, the prosecutor found a single reference to an alleged touching of M.W.'s vaginal area—*not* penetration thereof—in a medical report. (Docket #2, Ex. 18, at 49–52). Defense counsel had accused the prosecution of not disclosing that exhibit, but Judge Conen had previously found that the materials had been turned over. (Docket #2, Ex. 18, at 51–52). Accordingly, Judge Conen determined that the vaginal-touching allegations were not a surprise to Mr. Leather, and that the fact that M.W. had disclosed them for the first time while on the witness stand was "a wonderful opportunity for

impeachment." (Docket #2, Ex. 18, at 51). Accordingly, Judge Conen allowed the testimony to continue, and M.W. went on to describe the vaginal-touching incident in greater detail. (Docket #2, Ex. 18, at 52–62).

Then, on cross-examination, defense counsel attempted to impeach M.W. on the basis that she had not told anyone about the abuse before. (Docket #2, Ex. 18, at 81–82, 86–94). Apparently, M.W. had not told any of the investigators about the alleged vaginal touching throughout the pendency of the investigation, but had told a treating psychologist and her mother about it at some point recently. (Docket #2, Ex. 18, at 89–94).

Then M.W. stated that she had told the prosecutor about the allegation "yesterday," meaning July 7, 2009, when the two were having a meeting alone. (Docket #2, Ex. 18, at 94). Defense counsel stated that he believed that this made the prosecutor a witness, because, in chambers, the prosecutor "implied to [defense counsel]…" that the conversation never occurred. (Docket #2, Ex. 18, at 99–100). The prosecutor responded:

> To my knowledge, her description seemed substantially consistent with information in the file. There was nothing about what she disclosed during that very brief discussion, which I will note is the first discussion of any substance whatsoever I have ever had with that witness.
>
> As an attorney representing the State of Wisconsin, I am entitled some leeway to prepare my case. I am not – – It is not expected of me that I will have my hands tied behind my back and my mouth gagged. I'm allowed to briefly speak with witnesses to find out what their testimony will likely be; it's part of the preparation process.
>
> Now, if during this very brief conversation with this victim, which I will note, as we all well know, she suffers from autism, she has other limitations. The way she describes things, the words she uses can vary.

When I talked to her initially, of course I did not ask a bunch of probing questions like I did when she was on the stand. I just said tell me generally what happened. It seemed substantially consistent with the information before me.

*She did mention that he was, quote, "digging in her vagina," and there was reference to touching of the vagina in the medical records.*

If something had come out, say, that seemed to be – – exculpatory for the defense, substantially different from the information that's known to all of the parties at this time, I would have asked that an officer prepare a report regarding it and I would have asked that she be interviewed by an officer, a report prepared, and I would have brought it to the attention of counsel and the court.

(Docket #2, Ex. 18., at 103–04 (emphasis added)).

The parties discussed what to do about this situation in chambers, after which Judge Conen stated on the record that his "initial evaluation" was "that Ms. Lewis [the prosecutor] made herself a witness in this case." (Docket #2, Ex. 19, at 3). Judge Conen believed that this left three options: (1) if the prosecutor was *not* a witness, then the trial could go forward as planned; (2) if the prosecutor *was* a witness, then the District Attorney's office would have to supply someone else to try the remainder of the case; and (3) if no attorney could be supplied, then the matter may have to result in a mistrial. (Docket #2, Ex. 19, at 3). Judge Conen made clear that he was reserving making a final ruling; he then excused the jury to allow the parties to research and brief the matter further. (Docket #2, Ex. 19, at 3–4, 15).

Judge Conen resumed proceedings the next morning, with another Assistant District Attorney stepping in to address the pending matter while Ms. Lewis was subject to examination to determine whether she was a witness. (Docket #2, Ex. 20, at 3). Judge Conen laid the groundwork for the

determination that he would have to make: if M.W. had, indeed, told Ms. Lewis about the vaginal touching incident prior to her testimony, then that was a prior consistent statement and it would not be necessary to call Ms. Lewis as a witness; if, on the other hand, M.W. had not told Ms. Lewis about the incident, then it was a prior inconsistent statement and Ms. Lewis would be a witness as to M.W.'s credibility. (Docket #2, Ex. 20, at 3–4). Defense counsel argued that Ms. Lewis was trying to change her statement about what she had been told (Docket #2, Ex. 20, at 4–5); that defense was entitled to know about the alleged vaginal touching under *Brady v. Maryland*, 373 U.S. 83 (1963) because it could have used her failure to earlier report the incident in its opening statement as evidence of credibility (Docket #2, Ex. 20, at 5–6); and that defense had not had an opportunity to investigate Ms. Lewis' meeting with M.W., which was suspect because Ms. Lewis had not followed protocol by having a third party present during the meeting (Docket #2, Ex. 20, at 6).

The parties received a copy of Ms. Lewis' statements from the day before (Docket #2, Ex. 20, at 11–12), after which the parties engaged in additional argument (Docket #2, Ex. 20, at 12–24). Ms. Lewis then returned and was questioned by defense counsel; she testified that M.W. had described Mr. Leather as having previously dug into her vagina, but that she had not asked M.W. any further questions about that incident. (Docket #2, Ex. 20, at 29–30). Judge Conen then determined that Ms. Lewis would only be able to testify that M.W. had given a prior consistent statement and, accordingly, found that she was not a witness. (Docket #2, Ex. 20, at 34). Therefore, the trial was allowed to continue.

M.W. returned to court for the continuation of her cross-examination. (Docket #2, Ex. 20, at 35). The parties completed cross-examination, redirect,

and recross on July 9, 2009. (Docket #2, Ex. 20, at 35–62; Docket #2, Ex. 21, at 4–22). Ms. LeMahieu then appeared and gave her testimony. (Docket #2, Ex. 21, at 22–102; Docket #2, Ex. 22, at 3–41).

Mr. Leather, through defense counsel, then began to raise a number of issues that he believed were concerning. (Docket #2, Ex. 22, at 44). He was concerned that an incident of uncharged conduct—a 2006 allegation involving a hug given by Mr. Leather to M.W. after M.W. had left the shower—had been presented to the jury. (Docket #2, Ex. 22, at 44–47). Judge Conen expressed concern with this because the prosecutor had not cleared the prior bad acts with the Court and the act was not technically illegal, but ultimately found that there was no basis to bar the evidence because it was relevant. (Docket #2, Ex. 22, at 47–49). This was then discussed further, together with other concerns. (Docket #2, Ex. 22, at 49–55).

Mr. Leather then began to discuss his concern that the amended charges were unclear and duplicitous; this, in turn, prompted the prosecutor to request to amend the charges yet again. (Docket #2, Ex. 22, at 56–60). The Court granted that request. (Docket #2, Ex. 22, at 60). This precipitated more argument. (Docket #2, Ex. 22, at 60–70). The court was then adjourned. (Docket #2, Ex. 22, at 80).

Upon return, Mr. Leather, himself, testified. (Docket #2, Ex. 23, at 9–91). Several additional witnesses testified quickly, after which defense rested. (Docket #2, Ex. 23, at 91–107). The prosecutor called Ms. LeMahieu again, in rebuttal against Mr. Leather's testimony that his confession was false. (Docket #2, Ex. 24, at 3–18). The parties discussed jury instructions (Docket #2, Ex. 24, at 18–33), and then Judge Conen instructed the jury. (Docket #2, Ex. 24, at 34–46). Court resumed shortly thereafter, at which time the parties gave their closing arguments. (Docket #2, Ex. 25, at 4–32). Judge

Conen provided final instructions and selected the alternate jurors, then excused the jury to begin their deliberations. (Docket #2, Ex. 25, at 32–37).

The jury reached a verdict that same day, finding Mr. Leather guilty of both charges against him. (Docket #2, Ex. 25, at 39). Judge Conen denied Mr. Leather's motion for a directed verdict and set sentencing. (Docket #2, Ex. 25, at 42–43).

At the initial sentencing hearing, it became apparent that defense counsel may have engaged in inappropriate tactics in presenting privileged information to Judge Conen. (*See* Docket #2, Ex. 26, at 54–55). Judge Conen, therefore, adjourned the matter to conduct a further investigation into defense counsel's activity. (Docket #2, Ex. 26, at 55). Judge Conen did not take any further action after his investigation, and instead proceeded to sentence Mr. Leather to five years of initial confinement and five years of extended supervision on each charge, to run consecutive to one another for a total sentence of ten years of confinement and ten years of extended supervision. (Docket #2, Ex. 27, at 39–40).

### 1.7 Appeal of Conviction and Sentence

Mr. Leather appealed his conviction and sentence to the Wisconsin Court of Appeals. *Wisconsin v. Leather*, 2011 WI App 75, 334 Wis. 2d 146, 799 N.W.2d 928. The Wisconsin Court of Appeals affirmed the conviction and sentence. *Id.* at ¶ 47.

In doing so, it first held that Judge Conen was correct in finding that Ms. Lewis did not need to testify as a witness because her testimony would have gone only to prior consistent statements; in support, it cited *Chambers v. Mississippi*, 410 U.S. 284, 294–95 (1973) and *Wisconsin v. Shomberg*, 2006 WI 9, ¶ 35, 288 Wis. 2d 1, 709 N.W.2d 370. *Leather*, 2011 WI App 75, ¶¶ 7–22.

Second, the Wisconsin Court of Appeals held that Judge Conen properly barred use of the record of the unsubstantiated child abuse allegation made by M.W. against Mr. Leather, finding that those records were simply irrelevant. *Id.* at ¶¶ 23–26.

Third, the Wisconsin Court of Appeals affirmed all of the judges' rulings that Mr. Leather was not entitled to M.W.'s psychological and school records, under *Schiffra*, 175 Wis. 2d at 605–11. *Leather*, 2011 WI App 75, ¶¶ 27–38 (also citing *State v. Solberg*, 211 Wis. 2d 372, 564 N.W.2d 775 (1997); *State v. Green*, 2002 WI 68, ¶ 31, 253 Wis. 2d 356, 646 N.W.2d 298; *State v. Richard A.P.*, 223 Wis. 2d 777, 785, 589 N.W.2d 674 (Ct. App. 1998)).

Finally, it concluded that Judge Conen did not need to disqualify himself as biased, relying on Wis. Stat. § 757.19(2), *State v. American TV & Appliance of Madison, Ind.*, 151 Wis. 2d 175, 443 N.W.2d 662 (1989), and *State v. Rodriguez*, 2006 WI App 163, ¶ 36, 295 Wis. 2d 801, 722 N.W.2d 136 (itself citing *Liteky v. United States*, 510 U.S. 540, 555 (1994)). *Leather*, 2011 WI App 75, ¶ 39–46).

The Wisconsin Supreme Court denied Mr. Leather's petition for review on September 1, 2011. (Docket #2, Ex. 30).

### 1.8 Habeas Proceedings

Mr. Leather then filed a petition for a writ of habeas before this Court on November 28, 2012. (Docket #1). The matter was screened, after which the State raised issues regarding exhaustion and procedural default. (Docket #8). The Court reviewed briefs from the parties on those topics and allowed Mr. Leather's claims to proceed. (Docket #10, #11, #12). Thereafter, the parties filed the required briefs. (Docket #13, #15, #18).

This matter is now ready to be addressed on its merits.

2.  ANALYSIS

Mr. Leather is entitled to habeas relief only if "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Court begins by describing the standard that it must employ in determining whether Mr. Leather, in fact, is entitled to habeas relief. It then turns to the substance of his claims.

2.1  Standard of Review

Because the state courts adjudicated Mr. Leather's claims on their merits, the Court may grant a writ of habeas corpus only if the state court's decision was: (1) "contrary to…clearly established federal law, as determined by the Supreme Court of the United States"; (2) "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1–2). *See also Conner v. McBride*, 375 F.3d 643, 648–49 (7th Cir. 2004) (citing *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997)).

"A state court decision is contrary to clearly established federal law if the court applies a rule that plainly contradicts the Supreme Court's governing rule or if it comes to a result different than did the Supreme Court on substantially identical facts." *Avila v. Richardson*, 751 F.3d 534, 536 (7th Cir. 2014) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). *See also Kamlager v. Pollard*, 715 F.3d 1010, 1016 (7th Cir. 2013) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Williams*, 529 U.S. at 405–06; *McNary v. Lemke*, 708 F.3d 905, 913 (7th Cir. 2013)).

"A decision involves an 'unreasonable application' of Supreme Court precedent if the decision, while identifying the correct governing rule of law,

applies it unreasonably to the facts of the case." *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013) (citing *Williams*, 529 U.S. at 407). However, the Supreme Court has made clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. In fact, Mr. Leather will be entitled to habeas relief only if he can "show that the state court's ruling on the claim…was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 526 U.S. 86, 131 S.Ct. 770, 786–87 (2011). *See also Taylor v. Grounds*, 721 F.3d 809, 817 (7th Cir. 2013).

"A decision 'involves an unreasonable determination of the facts if it rests upon factfinding that ignores the clear and convincing weight of the evidence.'" *Bailey v. Lemke*, 735 F.3d 945, 949–50 (7th Cir. 2013) (quoting *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010); citing *Ward v. Sternes*, 334 F.3d 696 (7th Cir. 2003)).

Moreover, habeas relief "is unavailable to remedy errors of state law." *Perry v. McCaughtry*, 308 F.3d 682, 688 (7th Cir. 2002) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)). The Supreme Court has "repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" *Washington v. Sarausad*, 555 U.S. 179, 192 n.5 (2009) (quoting *Estelle*, 502 U.S. at 67–68). Therefore, "as a general rule," federal courts cannot overturn evidentiary determinations made by state courts. *Ruhl v. Hardy*, 743 F.3d 1083, 1098 (7th Cir. 2014) (citing *Waddington*, 555 U.S. at 192 n.5; *Estelle*, 502 U.S. at 67–68; *Huusko v. Jenkins*, 556 F.3d 633, 637 (7th Cir. 2009)). "Only in very rare cases where the state court's resolution of the evidentiary dispute was clearly unreasonable or otherwise implicates federal constitutional rights," should the court consider

granting "habeas relief on state law evidentiary questions." *Ruhl*, 743 F.3d at 1098 (citing *Martin v. Grosshans*, 424 F.3d 588, 591 (7th Cir. 2005)).

## 2.2 Substantive Review of Mr. Leather's Claims

Leather raises three claims for relief: (1) that his Sixth Amendment rights to compulsory process and confrontation were violated when Judge Conen barred him from calling the prosecutor, Ms. Lewis, as a witness to impeach M.W.; (2) that his Sixth Amendment right of confrontation was violated when Judge Conen barred him from using the unsubstantiated abuse report to impeach M.W.; and (3) that his Fourteenth Amendment right to due process of law was violated by Judge Conen's extreme bias against him. The Court will address each of those arguments in turn.

### 2.2.1 Prohibition on Calling Prosecutor

Mr. Leather argues that his Sixth Amendment rights to compulsory process and confrontation were violated by Judge Conen's ruling that the prosecutor would not be an impeachment witness against M.W.

As the Court discussed more fully in the background section, M.W. testified on the stand that Mr. Leather had touched her vagina. (Docket #2, Ex. 18, at 46–47). This was, apparently, the first time that Mr. Leather had even heard of this accusation. (Docket #2, Ex. 18, at 47–49). The accusation had never before been made on the record, and the charges against Mr. Leather at the beginning of the trial did not reflect the accusation. (*See* Docket #2, Ex. 18, at 47–52).

Accordingly, defense counsel attempted to impeach M.W. by establishing that she had never told anyone about the accusation before. (Docket #2, Ex. 18, at 81–82, 86–94). In a line of questioning about who, precisely, M.W. had previously told, M.W. testified that she had told the prosecutor, Ms. Lewis, the day before. (Docket #2, Ex. 18, at 89–94).

This revelation prompted defense counsel to request the ability to call Ms. Lewis as a witness. (Docket #2, Ex. 18, at 99–100). The defense's theory in that regard was that M.W. had either never told Ms. Lewis about this previous occurrence or explained the occurrence in different terms at trial than she had initially reported to Ms. Lewis. (*See* Docket #2, Ex. 18, at 99–104; Docket #2, Ex. 19; Docket #2, Ex. 20, at 3–34). That latter theory was based on M.W.'s trial testimony that Mr. Leather had been "digging in" her vagina, which defense counsel asserted could mean only penetration.

Judge Conen was sufficiently concerned about this occurrence that he decided to hold a hearing on the issue. (*See* Docket #2, Exs. 19, 20). At the hearing, Ms. Lewis testified in front of Judge Conen, stating that M.W. had, indeed, told her about the vaginal touching incident the day before. (Docket #2. Ex. 20, at 29–30). She explained that M.W. had told her that Mr. Leather had dug into her vagina. (Docket #2, Ex. 20, at 29–30). That testimony was entirely consistent with what she had told Judge Conen the day before. (Docket #2, Ex. 18, at 103–04 (including the following quote: "She did mention that he was, quote, 'digging in her vagina,' and there was reference to touching of the vagina in the medical records.")). She had not asked M.W. any follow-up questions about the vaginal touching incident, so she did not know whether M.W. believed that penetration had occurred.

With that testimony, Judge Conen concluded that M.W.'s statement on the stand was consistent with what she had told Ms. Lewis the previous day; accordingly, it was a prior consistent statement and not admissible as evidence.

So, does this claim require habeas relief? Certainly not as being "contrary to" clearly established federal law. As already discussed, this is satisfied only "if the court applies a rule that plainly contradicts the Supreme

Court's governing rule or if it comes to a result different than did the Supreme Court on substantially identical facts." *Avila*, 751 F.3d at 536 (citing *Williams*, 529 U.S. at 405–06). Mr. Leather relies primarily on *Chambers v. Mississippi*, 410 U.S. 284 (1973) to argue that his Sixth Amendment rights were violated. (*See* Docket #13 at 11–15). And the Wisconsin Court of Appeals—the highest court to discuss the merits of Mr. Leather's arguments—cited precisely that case in determining that Mr. Leather's Sixth Amendment rights were not violated, and *Chambers*' facts are not so similar to this case that *Chambers* would compel a certain result. *Leather*, 2011 WI App 75, ¶¶ 17–18. So, clearly, the Wisconsin Court of Appeals' determination was not "contrary to" clearly established federal law.

Perhaps Mr. Leather claims that there was an unreasonable application of federal law in this case. *Chambers* acknowledged that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers*, 410 U.S. at 302. But, even so, "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* The *Chambers* court determined that the trial court had erred in excluding trustworthy evidence on hearsay grounds in a mechanistic way to "defeat the ends of justice," by denying the defendant access to testimony that would have been critical to his defense. *Id.* So, courts cannot deny defendants "a meaningful opportunity to present a complete defense," on the basis of overly rigid application of state evidentiary rules. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). But there is no constitution violation so long as a state's rules either "are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve,'" or do not infringe upon a "weighty interest of the

accused." *United States v. Scheffer*, 523 U.S. 303, 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987); citing *Michigan v. Lucas*, 500 U.S. 145, 149 (1991); *Chambers*, 410 U.S. at 302; *Washington v. Texas*, 388 U.S. 14, 22–23 (1967)).

Applying that case law, the Court cannot find any unreasonable application of federal law. The Court assumes, *arguendo*, that Mr. Leather's weighty interest in impeaching M.W. was impacted by the denial of his ability to attack M.W.'s credibility through questioning Ms. Lewis. Even so, Judge Conen had a valid reason for prohibiting that line of questioning: Ms. Lewis' testimony would be consistent with M.W.'s. The Court of Appeals found that was the case, in addition to finding that Ms. Lewis' testimony about what M.W. had told her would have been barred as hearsay. That decision was not an incorrect application of state law. More to the point, it was not an unreasonable application of federal law. Mr. Leather was still able to present his full defense, which included impeaching M.W. on the fact that she had not told anyone of the vaginal touching incident until very recently. Judge Conen's denial of Mr. Leather's request to question Ms. Lewis was in no way arbitrary—Judge Conen conducted an evidentiary hearing on it—and was, ultimately, totally proportionate to the purpose it was designed to serve. The Wisconsin Court of Appeals found as much, citing the correct Supreme Court case and closely considering the evidentiary and constitutional issues before it. Certainly, the Wisconsin Court of Appeals' decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S.Ct. at 786–87. Mr. Leather has not cited any authority to establish as much—he has not even cited any authority that would establish that the decision was *wrong*—and the Court cannot find any.

Furthermore, there was no "unreasonable determination of the facts," as required for relief under 28 U.S.C. § 2254(d)(2). Both Judge Conen and the Wisconsin Court of Appeals determined that Ms. Lewis' testimony would have been consistent with M.W.'s. That is, Ms. Lewis would have testified that the day before M.W. had stated that Mr. Leather touched or dug in her vagina. Mr. Leather attempts to dispute this by arguing that M.W. had testified that Mr. Leather had penetrated her vagina, whereas Ms. Lewis did not know that penetration had occurred. (*See* Docket #18 at 4–5).

The Wisconsin Court of Appeals considered this argument and rejected it, noting that "[p]enetration was counsel's term, not M.W.'s." *Leather*, 2011 WI App 75, ¶ 21. To be sure, M.W.'s use of the words "dig" or "digging" and "in" were confusing. Reading the record, they may imply actual penetration. Nonetheless, the words are vague and, as the Wisconsin Court of Appeals noted that Judge Conen found, "consistent with the quasi-penetration statement" that M.W. made on the record. *Id.* at ¶ 13. But, even if the Court were to find that M.W. *had* clearly implied penetration in her trial testimony, Ms. Lewis' testimony would *still* have been consistent with it. There were many consistencies—most importantly, the use of the word digging (*see id.* at ¶ 14)—and any inconsistencies were due to the fact that Ms. Lewis did not ask detailed and probing questions in the pretrial discussion with M.W.[4]

Mr. Leather attempts to undermine this by pointing out that it would be strange that Ms. Lewis would not have attempted to amend the charges if she had known about the vaginal touching. (Docket #18 at 2–3). But there

---

[4]The Court should also reiterate that those inconsistencies exist only with Mr. Leather's strained and overly literal reading of M.W.'s trial testimony to imply penetration.

are many potential explanations for that: perhaps Ms. Lewis did not want to amend the charges again before trial, which may have opened the door for more delays. Whatever the reason, this evidence is not clear and convincing as to the fact that Ms. Lewis had not known about the allegations before M.W.'s trial testimony.

Simply put, the Wisconsin Court of Appeals' and Judge Conen's decision were both entirely *reasonable* determinations of the facts. There certainly is not clear and convincing evidence to the contrary.

Accordingly, there is no reason to award habeas relief to Mr. Leather on the basis of this claim.

### 2.2.2   Prohibition on Entry of Unsubstantiated Report

Judge Conen refused to allow Mr. Leather to introduce into evidence the record of an unsubstantiated claim of abuse made by M.W. against Mr. Leather. (Docket #2, Ex. 15, at 6–19). Judge Conen refused to receive the report into evidence, but the Wisconsin Court of Appeals examined the record to determine the relevant facts regarding the report. *Leather*, 2011 WI App 75, ¶ 24. It noted:

> The document is reported to reflect an allegation, made by an undisclosed person, to a CPS worker that Leather injured M.W. by grabbing her wrists and shoving her because he was mad at M.W. for slamming a door. M.W. confirmed the door-slamming, but told a CPS worker that "she didn't get injuries to her wrist as a result of that incident" other than a "few small scratches she got from rubbing her arm on the wall." The court read a portion of the report which stated that Leather "felt bad for what happened and…will be going to see a counselor…to learn how to better work with [M.W.] and her special needs." The court further read that the CPS worker closed the case as "unsubstantiated for physical abuse." Leather's counsel inferred that the reporting person was M.W. and argued that M.W.'s subsequent denial that Leather caused

injury to her wrist meant that M.W. lied about Leather physically abusing her. The trial court excluded evidence of the prior "false" allegation of physical abuse on the grounds that it was irrelevant. We agree that the information contained in the discussion about the CPS report was irrelevant to any issue in this case and was therefore inadmissible.

*Leather*, 2011 WI App 75, ¶ 24. The Wisconsin Court of Appeals discussed this further, again reaffirming its finding that the report was irrelevant:

Leather's insistence on the admission of the report was based solely on information that someone made an allegation to CPS that he physically abused M.W. and that M.W. denied that allegation. The portion of the report read by the trial court reflects that Leather partially confirmed the truth of that allegation by telling the CPS worker that he "felt bad for what happened" and would see a counselor "to learn how to better work with [M.W.]." The CPS worker concluded that the allegations were unsubstantiated. "Unsubstantiated" is not the equivalent of "false"; rather, it implies that there was inadequate evidence for CPS to proceed. There is no evidence that M.W. made the allegation. The mere fact that someone accused Leather of physically abusing M.W. does not have any tendency to make M.W.'s later claim of sexual assault by Leather either more or less credible. The record does not contain expert or other testimony linking the allegation of physical abuse with the allegation of sexual assault. Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination" of the matter at issue either "more probable or less probable than it would be without the evidence." Id. The physical abuse allegations by an unknown party and denied by M.W. are irrelevant to the sexual assault allegation made by M.W.

*Id.* at ¶ 26.

The Court begins its analysis of Mr. Leather's claim that this violated his Sixth Amendment right of confrontation by pointing out that he does not assert that any decision was "contrary to" clearly established federal law.

Nor could he—nothing in the Wisconsin Court of Appeals' decision relies on an erroneous rule of law.

Next, the Court notes that the Wisconsin Court of Appeals' factual determination was not unreasonable. It correctly recounts the record of the trial court, and reasonably determines that there was no evidence that M.W., herself, actually made the abuse report in question. *Id.* at ¶¶ 24, 26. As the Wisconsin Court of Appeals noted, it appears from the record that the allegation was made by an "undisclosed person" or "*someone.*" *Id.* (emphasis in original). Mr. Leather asserted—and continues to assert—that M.W., herself, made the report. But he does not argue that as a basis for finding that the Wisconsin Court of Appeals' factual determination was unreasonable, nor is there any indication in the record that such determination is incorrect. Again, most certainly, there is no clear and convincing evidence to contradict the Wisconsin Court of Appeals' factual determination.

With the factual background established, the Court next points out that the Wisconsin Court of Appeals' relevance determination was correct. Mr. Leather ignores important portions of the Wisconsin Court of Appeals' analysis and elides others in making his argument. First, the Wisconsin Court of Appeals noted that the abuse allegations were made by "an undisclosed person." On that basis, alone, the Wisconsin Court of Appeals' determination that the report was irrelevant would have been justified. If another individual made the initial report, then any impact on M.W.'s credibility would have been exceedingly limited. Second, he does not acknowledge the fact that the report included a statement that would have indicated that an incident had occurred, even if not in the precise way that *he claims* M.W. claimed: he "felt bad for what happened and…will be going to see a counselor…to learn how to better work with [M.W.] and her special needs."

*Id.* at ¶ 24. That statement undermines Mr. Leather's claim that the report was fully exculpatory. These facts significantly undermine the relevance of the report, and make clear that the Wisconsin Court of Appeals' relevance determination was correct (and at the very least reasonable).

Therefore, the Wisconsin Court of Appeals' decision could not be an unreasonable application of federal law,[5] because there is no basis to conclude that the state's evidentiary ruling must give way to the defendant's Sixth Amendment rights, here.

Certainly, there is no constitutional right to confront witnesses with or on the basis of *irrelevant* evidence. So, to the extent that the Wisconsin Court of Appeals' decision was correct on the relevance issue, it could not be called an unreasonable application of federal law.

Even if the Court were to look at the issue more broadly, though, it would conclude that Mr. Leather's rights were not violated. As Mr. Leather points out in his reply brief, "a violation of the right to present a defense does not occur any time such evidence is excluded, but rather only when its exclusion is arbitrary or disproportionate to the purposes the exclusionary rule is designed to serve." (Docket #18 at 11 (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Lucas*, 500 U.S. at 151)). Weighing the value of the

---

[5]The Court points out that, while the Wisconsin Court of Appeals' decision does not cite any federal law on this topic, that does not present a problem. *See Richardson v. Lemke*, 745 F.3d 258, 276 (7th Cir. 2014) (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) for the proposition that "a state court decision that does not cite federal precedent is still consistent with federal law so long as neither the reasoning nor the result of the state court decision contradicts the Supreme Court's decisions."). In *Richardson*, the Seventh Circuit noted the difficulty of applying this rule in cases where the state courts rely fully on state evidentiary law, but nonetheless determined that the application was not unreasonable. This Court will take the same path.

evidence against the role the exclusion served, the Court must determine that the exclusion was reasonable: as to value, the report was of little probative weight; and that limited probative value, alone, was also the reason for exclusion in this case—to prevent irrelevant evidence from muddying the presentation of the evidence.

Finally, the Court notes that, even if the evidence should not have been excluded, Mr. Leather's rights still were not violated. Mr. Leather was merely prevented from introducing the extrinsic evidence of the report, which is constitutionally kosher. *Nevada v. Jackson*, --- U.S. ---, 133 S. Ct. 1990, 1994 (2013) (Confrontation Clause does not "entitle[] a criminal defendant to introduce *extrinsic evidence* for impeachment purposes" (emphasis in original)) (citing *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) (*per curiam*); *Jordan v. Warden*, 675 F.3d 586, 596 (6th Cir. 2012); *Brown v. Ruane*, 630 F.3d 62, 70 (1st Cir. 2011)). "[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to…expose infirmities through cross-examination." *Id.* Mr. Leather certainly had that opportunity, here, having questioned M.W. and his ex-wife about whether M.W. had lied about him. (Docket #2, Ex. 18, at 86; Docket #2, Ex. 16, at 68–70). This is not a case like *Davis v. Alaska*, 415 U.S. 308 (1974), which Mr. Leather relies on heavily, because Mr. Leather was not entirely foreclosed from impeaching M.W.'s credibility in a certain area. Mr. Leather had an opportunity to impeach M.W.—just not through the (in the Court's opinion irrelevant) report—and that was all that was constitutionally required.

For all of these reasons, Mr. Leather's claim regarding the barring of the report does not entitle him to habeas relief.

### 2.2.3  Judicial Bias

Mr. Leather's final argument is that Judge Conen was biased, violating his due process rights. That is simply not the case, here.

Mr. Leather cites to *Offutt v. United States*, 348 U.S. 11 (1954) in support of his contention that trial judge bias can constitute a due process violation. In that case, the Supreme Court stated that:

> The vital point is that in sitting in judgment on such a misbehaving lawyer the judge should not himself give vent to personal spleen or respond to a personal grievance. These are subtle matters, for they concern the ingredients of what constitutes justice. Therefore, justice must satisfy the appearance of justice.

*Id.* at 14. Aside from the fact that this would be an extremely nebulous standard to apply to find a constitutional violation—when and how does a judge fail to "satisfy the appearance of justice"? how much spleen must a judge vent before crossing a constitutional line?—the Court does not believe that it is a due process case. Rather, as the State correctly points out, it is a case concerning the abilities of district court judges to exercise their contempt power; the phrase "due process" does not appear even *once* in the body of the opinion. *See id.* Mr. Leather cites cases that have discussed *Offutt* in conjunction with due process. (Docket #18 at 13–14 (citing *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971)).

But, even accepting *Offutt* as setting forth a due process standard, the trial judge did not violate that standard, here. To be sure, there were moments in which the trial judge may have lashed out at Mr. Leather and defense counsel. But on just as many occasions—or more—Judge Conen readily acknowledged that defense counsel was not responsible for delays; he also occasionally referred to the case as mismanaged, implying

dissatisfaction with the prosecution's and other judge's handling of the case. Moreover, occasionally some frustration with the defense was appropriate: the record is replete with defense counsel's . In any event, Judge Conen provided the jury with the following instruction: "If any Member of the Jury has an impression of my opinion as to whether the defendant is guilty or not guilty, disregard that impression entirely and decide the issues of fact solely as you view the evidence." (Docket #2, Ex. 23, at 36). That, of course, lessens any potential impact that his alleged bias would have on their deliberations. And, otherwise, the Court simply cannot conclude that Judge Conen's activities were so improper as to deny Mr. Leather of his due process rights.

Any trial judge will occasionally express frustration with counsel, but still satisfy the appearance of justice. Judge Conen did so, here. In spite of a few slight issues, the record reflects the appearance of justice. At the very least, individuals could disagree over that decision; it certainly is not an unreasonable application of federal law. Moreover, there is not any case law to which his actions were explicitly contrary,[6] nor does Mr. Leather identify any unreasonable determination of facts, so neither 28 U.S.C. § 2254(d)(1) or (2) provide a basis for relief.

---

[6]The only Supreme Court cases on the issue of bias deal with financial interest and criminal contempt situations, neither of which apply, here. *See, e.g.*, *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927); *In re Murchison*, 349 U.S. 133 (1955)). In *FTC v. Cement Institute*, the Supreme Court noted that "most matters relating to judicial qualification [do] not rise to a constitutional level"; further, "matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion." 333 U.S. 683, 702 (1948). The *Caperton* court included those quotations in its decision, and largely left them intact—departing only in discussing the issue of bias as a result of judicial elections, which it described as "an extraordinary situation where the Constitution requires recusal." *See* 556 U.S. at 876–890

For all of these reasons, Mr. Leather's claim for judicial bias cannot form the basis for habeas relief.

Mr. Leather requests an evidentiary hearing on this issue (Docket #13 at 37–38), but that is not necessary. He seeks to admit "a plethora of letters from various individuals (mostly professionals, including a Lutheran minister) who were present for various and significant portions of the trial, and who are prepared to testify the judicial demeanor and temperament during the underlying state court proceedings suggested/revealed palpable scorn and contempt for defense counsel and Leather." (Docket #13 at 37). However, 28 U.S.C. § 2254(e)(2) provides that a petitioner is not entitled to proceed with an evidentiary hearing "[i]f [he] has failed to develop the factual basis of his claim in state court proceedings." Mr. Leather acknowledges that "he theoretically could have produced such witnesses in a state court post-conviction motion." (Docket #13 at 37–38). He tries to justify this by pointing out that some individuals came forward after he had filed his notice of appeal and the motion likely would have been unsuccessful, anyway. (Docket #13 at 38). But that does not change the fact that he chose never to present this claim before the state court: he "failed to develop the factual basis of [his] claim," and therefore an evidentiary hearing is inappropriate. 28 U.S.C. § 2254(e)(2). Perhaps the Court should excuse that failure, *see Avila v. Richardson*, 751 F.3d 534, 537 (7th Cir. 2014) (quoting *Williams v. Taylor*, 529 U.S. 420, 432 (2000): "failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel"), or find that Mr. Leather could not have previously discovered the factual predicate of this claim, *see* 28 U.S.C. § 2254(e)(2)(A)(ii).

Either of those situations is doubtful, but even if the Court found they existed, it still would not be necessary to hold an evidentiary hearing on this claim. To be entitled to an evidentiary hearing, Mr. Leather must "satisfy the pre-AEDPA standard. He must show '(1) the petitioner alleges facts which, if proved, would entitle him to relief and (2) the state courts, for reasons beyond the control of the petition, never considered the claim in a full and fair hearing.'" *Avila*, 751 F.3d at 537 (quoting *Davis v. Lambert*, 388 F.3d 1052, 1060–61 (7th Cir. 2004)). As already discussed, Mr. Leather's constitutional claim is not cognizable. However, even if it were cognizable, the Court would not change its mind about the fairness of the trial if it considered statements of the proffered additional witnesses. The Court has pored over every single transcript filed (as evidenced by the lengthy factual recitation at the beginning of this order) and found nothing of great concern. Additional testimony would add little to that equation. Moreover, the petitioner *did* have—*by his own admission* (Docket #13 at 37–38)—control over whether to present this argument before the state courts and yet did not present it to them. Accordingly, even the second prong of the pre-AEDPA standard is not satisfied.

In sum, there are multiple reasons why an evidentiary hearing is both inappropriate and unnecessary in this instance.

3. CONCLUSION

For all of the foregoing reasons, the Court is obliged to deny Mr. Leather's petition for a writ of habeas corpus. To be sure, Mr. Leather's case was not well handled by the prosecution or Milwaukee County Circuit Court—the immense delays, rotating cast of assigned judges and lawyers, and confusion surrounding Mr. Leather's pretrial motions, are all concerning. But Mr. Leather has not presented those to the Court, nor would they—or

any other aspect of this case—occasion habeas relief. Accordingly, the Court must deny Mr. Leather's petition.

Finally, under Rule 11(a) of the Rules Governing Section 2254 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), Mr. Leather must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citations omitted). While Rule 11(a) permits a district court to direct the parties to submit arguments on whether a certificate of appealability should be issued, additional arguments are not necessary here. As the Court discussed extensively, above, reasonable jurists would not debate whether the petition should have been resolved in a different manner. No reasonable jurist would find it debatable that Mr. Leather's petition fails to make any showing—let alone a substantial showing—of a violation of a constitutional right. As a consequence, the court must deny a certificate of appealability as to the petitioner's petition.

Accordingly,

IT IS ORDERED that the petitioner's petition for a writ of *habeas corpus* (Docket #1) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that a certificate of appealability as to the petitioner's petition be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED with prejudice.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of October, 2014.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge